UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | |
|---|---|
| JM McCORMICK COMPANY, INC.,      ) | |
|     Plaintiff/Counterclaim Defendant,   ) | |
|                              ) | |
|     vs.                                    ) | 1:05-cv-146-RLY-TAB |
|                              ) | |
| INTERNATIONAL TRUCK & ENGINE   ) | |
| CORPORATION,                   ) | |
|     Defendant/Counterclaim Plaintiff,   ) | |
|                              ) | |
| HOOVER TREATED WOOD        ) | |
| PRODUCTS, INC.,                  ) | |
|     Intervenor.                   ) | |

**ENTRY ON JM McCORMICK COMPANY INC.'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (DOCKET # 65), INTERNATIONAL TRUCK AND
ENGINE CORPORATION'S MOTION FOR SUMMARY JUDGMENT
(DOCKET # 90), INTERNATIONAL TRUCK AND ENGINE CORPORATION'S
MOTION TO SUPPLEMENT EVIDENCE (DOCKET # 103), AND
INTERNATIONAL TRUCK AND ENGINE CORPORATION'S REQUEST FOR
ORAL ARGUMENT (DOCKET # 105)**

## I.      Introduction

JM McCormick Company, Inc. ("McCormick") filed the present action on January

28, 2005, against International Truck and Engine Corporation ("International Truck") for

breach of the contract under which McCormick supplied plywood to International Truck

for use in the manufacture of its buses.  International Truck counterclaimed against

McCormick alleging breach of contract, including failure to indemnify, breach of implied

warranties, and fraud.  McCormick now moves for partial summary judgment pursuant to

1

Federal Rule of Civil Procedure 56 on International Truck's counterclaims for breach of contract relating solely to indemnification, breach of warranties, and fraud.  International Truck also moves to supplement evidence in support of its Response to McCormick's motion for partial summary judgment.  In addition, International Truck moves for summary judgment pursuant to Rule 56 on McCormick's breach of contract claim and seeks oral argument on both pending summary judgment motions.

For the reasons set forth below, McCormick's motion for partial summary judgment is **DENIED** in part and **GRANTED** in part; International Truck's motion to supplement evidence is **DENIED**; International Truck's motion for summary judgment is **DENIED**; and International Truck's request for oral argument is **DENIED**.

## II.      Motion to Supplement Evidence

Before setting forth the facts in this case, the court must address International Truck's motion to supplement evidence submitted in opposition to McCormick's motion for partial summary judgment.  International Truck seeks to admit evidence that Tom Forrest, a representative of McCormick, participated in a meeting where problems with ACQ treated plywood causing corrosion in school buses was discussed, implying that McCormick had actual and timely notice of International Truck's corrosion problem with the ACQ treated plywood McCormick supplied.  McCormick argues that such evidence is irrelevant because there is no evidence that the meeting was with International Truck and it does not save International Truck from its duty to notify McCormick within a

2

reasonable time of the alleged breach in warranty.

The relevant Uniform Commercial Code ("UCC") section governing the issue of notice sets forth: "Where a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . ."  U.C.C. § 2-607(3)(a).  Under the Illinois version of the UCC, cited by International Truck, if the seller has actual notice of the defect in a product, the buyer's duty to notify the seller in a reasonable time of the breach in warranty is obviated.  *Maldonado v. Creative Woodworking Concepts, Inc.*, 694 N.E.2d 1021, 1026 (Ill. App. Ct. 1998).  However, as discussed in Section V, *infra*, Arkansas law applies to the contract disputes in this case.

Under Arkansas law, notice by the buyer to the seller of the alleged breach is a condition precedent to recovery for breach of warranty.  *L.A. Green Seed Co. of Ark. v. Williams*, 438 S.W.2d 717, 720 (Ark. 1969); *see also* ARK. CODE § 4-1-201(26)[1] ("A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it.").  The court has found no case where an Arkansas court has applied the "actual notice of defect" exception to the traditional notice requirement set forth in UCC § 2-607(3)(a).

As such, any evidence that McCormick may have had actual notice of corrosion

---

[1] The court will cite the Arkansas version of the UCC that was in effect when this case was filed on January 28, 2005.  The Arkansas UCC was amended effective August 1, 2005, but no substantive changes were made to the code sections applicable in this case.

problems in ACQ treated plywood is not relevant in this case.  The issue is whether International Truck gave McCormick timely notice of McCormick's alleged breach. International Truck's motion to supplement evidence is therefore **DENIED**.

### III.     Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Some alleged factual dispute that does not rise to a genuine issue of material fact will not alone defeat a summary judgment motion. *Id.* at 247–48.

In deciding whether a genuine issue of material fact exists, the court views the evidence and draws all inferences in favor of the nonmoving party. *Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).  However, when a summary judgment motion is made and supported by evidence as provided in Rule 56(c), the nonmoving party may not rest on mere allegations or denials in its pleadings but "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

## IV.    Statement of Facts

### A.    The Parties

1.    McCormick is a lumber products wholesaler and a supplier of wood paneling to the tractor-trailer and bus industries.  (McCormick's Complaint and Demand for Jury Trial ("Complaint") ¶ 8).

2.    McCormick is incorporated in Indiana and maintains its principal place of business in Indianapolis, Indiana.  (Complaint ¶ 1).

3.    International Truck designs, assembles, and manufactures heavy-duty and medium-duty trucks, severe service vehicles, school bus chassis, and mid-range diesel engines.  (Defendant and Counterclaim Plaintiff International Truck's Third Amended Answer to Plaintiff's Complaint ("Answer") ¶ 3).

4.    International Truck is incorporated in Delaware and maintains its principal place of business in Warrenville, Illinois.  (Answer ¶ 2).  International Truck does business in Indiana and owns facilities in Indiana, including a foundry plant in Indianapolis, Indiana.  (Answer ¶ 4).

5.    McCormick first began supplying plywood to International Truck's predecessor, Amtran, in 1994.  (Deposition of Thomas R. Forrest ("Forrest Dep. A")[2] at 19–20,

_____

[2] Both parties have cited portions of certain witness' depositions but only attached the portions of the depositions that they cite.  Because this Entry addresses both parties' motions for summary judgment, there are multiple, incomplete copies of some witness' depositions in the record.  Where this occurs, the court will refer to the depositions by the witness' name followed by "A", "B", etc., in order that the parties know where in the record the court located the specific page number of a deposition.

McCormick's Appendix of Materials in Support of Motion for Partial Summary Judgment ("Docket # 66") Ex. 5).

6.    McCormick supplied plywood to International Truck's facilities in Conway, Arkansas, and Tulsa, Oklahoma.  (Answer ¶ 12).

7.    International Truck's purchasing authority under its agreement with McCormick was at its headquarters in Illinois.  (Deposition of Thomas R. Forrest ("Forrest Dep. B") at 35, International Truck's Designation of Evidence in Support of its Response in Opposition to McCormick's Motion for Summary Judgment ("Docket # 88") Ex. 2).

8.    International Truck directed its plywood orders to McCormick's facility in Conway, Arkansas.  (Deposition of Angela Daugherty ("Daugherty Dep. A") at 22, Docket # 88 Ex. 4).

9.    McCormick took possession of and cut the lumber used for the International Truck account in Arkansas.  (Deposition of Edwin Espey ("Espey Dep.") at 12, Docket # 88 Ex. 1).

**B.    The CSA**

10.   In September 2000, McCormick and International Truck entered into a Comprehensive Supply Agreement ("CSA") under which McCormick was to supply plywood to International Truck for use in the manufacture of buses.  (CSA at ¶ 2, International Truck's Designation of Evidence in Support of Motion for Summary Judgment ("Docket # 92") Ex. F).

6

11.     Tom Forrest ("Forrest") and Ed Espey of McCormick went to International Truck's office in Illinois to discuss entering into the CSA before it was signed. (Forrest Dep. B at 33).

12.     The final details of the CSA were negotiated through a series of letters sent between McCormick's headquarters in Indiana and International Truck's office in Illinois. (Forrest Dep. B Exs. C, D, E, F).

13.     The CSA stated that it was for a five-year term, commencing October 1, 2000, and ending September 30, 2005, "unless otherwise terminated as provided herein." (CSA at ¶ 1).

14.     Under the CSA, International Truck was to buy 100% of its plywood needs from McCormick "as they presently exist and are detailed in the written specifications, drawings, design and style of [International Truck], attached hereto as Exhibit A. (Current production contract #KJ060B)." (CSA at ¶ 2).

15.     At the time, International Truck's specifications were for untreated plywood. (*See* Answer ¶ 22).

16.     The CSA included a paragraph entitled "Competitive Clause," which stated that International Truck was required to give McCormick the opportunity to cure a deficiency in a "particular Product part number" if that product was not competitive in price, performance, delivery, reliability, technology or quality before International Truck terminated the CSA for that deficiency. (CSA at ¶ 18).

17.     The CSA also set forth a formula to account for price volatility in the marketplace.

(CSA at ¶ 11).  The price adjustment portion of the CSA stated in pertinent part:

> Changes in plywood pricing will be based on the Industry Publication <u>Random Lengths</u> published price for Southern Yellow Pine nineteen thirty seconds BC exterior plywood.
>
> Pricing for January, February, and March will be based on the published price in <u>Random Lengths</u> for the first week in December. . . .  [The pricing for each quarter thereafter followed this model, using the published price for the first week of the month preceding the quarter.]
>
> Price changes (cumulative) must be 10% or greater in either direction before the contract price will be changed.  Any pricing charge 10% or greater in either direction will be calculated at 65% of the total percentage charge.  For example, an upward movement of 12% would result in a price increase of 7.8%.

(CSA at ¶ 11).

18.   The CSA provided for a periodical reduction in prices that was spread over the life of the contract.  (CSA at ¶ 11).

19.   Any time that one of the above-described price changes occurred, International Truck would confirm the price change by printing out a green price sheet indicating the change.  (Deposition of Matthew Warrelman ("Warrelman Dep. A") at 63–64, Docket # 66 Ex. 12).  Then International Truck would send the green sheets to McCormick to review, sign, and send back to International Truck. (Warrelman Dep. A at 66–67).  McCormick did not always sign and send back the green sheets. (Warrelman Dep. A at 67–69).  International Truck also referred to these green sheets as contracts.  (*See* Warrelman Dep. A at 66).

20.    The green sheets contained International Truck part numbers on the left-hand side

of the sheet and a contract number in the top right-hand corner.  (*See* Warrelman

Dep. A at 63–64).  The contract numbers began with either an "A" or a "K"

(Warrelman Dep. A at 64).  For example, one green sheet exchanged between

McCormick and International Truck had the contract number "AM11OB."  (Green

Sheet, Docket # 66 Ex. 13).

21.    The back of the green price sheet contained "additional terms and conditions,"

which included an indemnification clause stating that seller (McCormick) agreed

to indemnify buyer (International Truck) for claims from any defect in the supplied

product (the plywood).  (Back of Green Price Sheet, Docket # 66 Ex. 13).

### C.    Change to Treated Plywood

22.    McCormick began supplying treated plywood to International Truck in August

2002 pursuant to International Truck's request.  (Answer ¶ 22).

23.    International Truck proposed setting up a separate contract for the treated plywood

part numbers.  (International Truck April 25, 2002, email, Docket # 92 Ex. 15).

24.    International Truck sent McCormick an email on May 22, 2002, addressing the

changes with respect to treated plywood.  (International Truck May 22, 2002,

email, Docket # 92 Ex. 17)  The email stated in pertinent part:

> As we discussed, J.M. McCormick will provide ACQ treated
> plywood flooring for both the Tulsa, Ok and Conway, Ar -
> American Transportation locations.  The flooring part number
> involved will be deleted from the current contract (KM403B)
> and added to a new contract.  The new pricing will reflect an

8.6% piece price reduction for the treated product and will be for a 12 month duration; effective date to be agreed upon.

Referencing letter dated September 14, 2000, which was the contract agreement put into place for KM403B, the following items will apply for treated plywood.

3.  Fluctuations in plywood pricing will be determined from Random Lengths published price of Southern Yellow Pine nineteen thirty seconds BC exterior plywood.  Price adjustments will be determined on a quarterly basis approximately two weeks before the quarter.

(International Truck May 22, 2002, email).

25.   McCormick replied: "J M Mcormick [sic] agrees with all your provisions in your contract relating to treated wood for International.  We will forward warranty certificate within two weeks.  Thank you so much for the order."  (McCormick May 23, 2002, email, Docket # 88 Ex. 1).

26.   An internal International Truck document entitled "Plywood Strategy, Matthew Warrelman 2003" stated that 100% of flooring and seat plywood is supplied by McCormick and that International Truck had a CSA on "current business." (Plywood Strategy at 3, Docket # 101 Ex. 8)

27.   In 2003, McCormick was supplying both treated and untreated plywood to International.  (Deposition of Matthew Warrelman "Warrelman Dep. B" at 123, Docket # 101 Ex. 5).

**D.** **Facts Relevant to Breach of Implied Warranty Claims**

**1.** **Notice**

28.    In July or August of 2003, International Truck learned of corrosion issues in the

seat tracks of some of the buses it manufactured.  (Deposition of Alan Osterkil

("Osterkil Dep. A") at 98–99, Docket # 66 Ex. 2).

29.    Upon learning of the corrosion problem, International Truck contacted its

suppliers, allegedly including McCormick.  (Osterkil Dep. A at 101).  However,

International Truck's reliability manager, who testified that McCormick was

contacted about the corrosion issue, did not contact McCormick himself.

(Deposition of Alan Osterkil ("Osterkil Dep. B") at 5–6, Docket # 88 Ex. 5;

Deposition of Alan Osterkil ("Osterkil Dep. C") at 124, JM McCormick Company,

Inc.'s Supplemental Appendix of Materials in Support of Motion for Partial

Summary Judgment ("Docket # 96") Ex. 1).  Rather, someone in International

Truck's purchasing department told him that McCormick had been contacted.

(Osterkil Dep. C at 124).

30.    By September 2003, after some internal testing, International Truck concluded that

the cause of the corrosion was the chemicals used in the treated plywood.

(Osterkil Dep. A at 134, 153).

31.    In the feedback form given to McCormick in June 2003, International Truck

informed McCormick of the intermittent quality problems it had experienced with

McCormick's treated plywood and of a warranty claim International Truck had

received on a bus where the plywood was delaminating.  (Forrest Dep. B Ex. KK, LL at ¶ 6).

32.   On June 28, 2005, International filed its Second Amended Answer in this litigation, which included a counterclaim for breach of implied warranty. (International Truck's Second Amended Answer, Docket # 36).

33.   On November 14 and December 22, 2005, International Truck sent McCormick letters detailing problems with McCormick's plywood, including corrosion and delamination.  (November 14, 2005, letter, Docket # 88 Ex. 6; December 22, 2005, letter, Docket # 88 Ex. 7).

34.   Prior to the counterclaim for breach of implied warranty, Mr. Forrest was never aware that there was an issue with the performance of the treated plywood in International Truck's buses relating to corrosion.  (Deposition of Thomas R. Forrest "Forrest Dep. C" at 290–91, Docket # 96 Ex. 2).

**2.   Disclaimer**

35.   McCormick supplied International a warranty entitled "Ten Year Plywood Subflooring Limited Warranty."  (McCormick Limited Warranty, Docket # 66 Ex. 8).  The warranty stated in pertinent part:

> Original purchasers or "first-owners" of specific pressure preservatively treated plywood bus subflooring products from J.M. McCormick Company, Inc. containing solely Osmose brand NW100 registered Chemical(s) are eligible for a **TEN YEAR LIMITED WARRANTY**. . . .
>
> FIRST OWNER COVERAGE

12

To qualify for the pressure preservatively treated plywood Ten Year Plywood Subflooring Limited Warranty, the claim must be made by the original purchaser of a bus which contains NatureWood preserved plywood supplied by J.M. McCormick Company.  This warranty is not transferable from the first-owner to subsequent owner of the bus. . . .

NOTE: The obligation of J.M. McCormick Company under the terms of this Warranty is limited to replacement of damaged pressure preservatively treated plywood only.  **J.M. McCormick Company make [sic] no other warranties, express or implied, of merchantability, fitness for a particular purpose or otherwise.  In no event shall J.M. McCormick Company be liable for incidental, consequential, special or indirect damages.  Nothing in this warranty shall affect the duration of implied warranties beyond their customary duration, or create additional implied warranties.**

(McCormick Limited Warranty at 1, 3) (emphasis in original).

### 3.    Inspection

36.    In April 2002, before McCormick started supplying treated plywood to International Truck, International Truck tested the corrosive effects of treated plywood on school bus floor fasteners.  (April 9, 2002, Testing Report at 1, Docket # 66 Ex. 10).  The test revealed that "[n]either Copper azole treated plywood nor ACQ plywood have adverse effects on the floor screws when exposed to humidity."  (April 9, 2002, Testing Report at 1).

37.    At that time, a test by the American Wood Preservers' Association ("AWPA") was also available that could detect corrosion.  (Osterkil Dep. B at 82).  However, International Truck was unaware of the AWPA test in April 2002 when it was

13

testing for corrosion on the bus screws.  (Osterkil Dep. B at 82).

38.    International Truck is not an expert in plywood and relies primarily on its suppliers

for testing information.  (Osterkil Dep. B at 112).

39.    When International Truck later employed the AWPA test on the metal track

material—the material that was corroding on International Truck's buses and

sparking complaints—the results revealed less severe corrosion than what

International Truck was experiencing in the field.  (Osterkil Dep. B at 111–12).

### E.    Facts Relevant to Fraud Claim

#### 1.    Quality of Treated Plywood

40.    On August 13, 2002, International Truck received a shipment of plywood from

McCormick, which International Truck's plant manager in Conway, Arkansas,

Peter Chapman ("Chapman"), characterized as "substandard."  (Deposition of

Peter Chapman ("Chapman Dep. A") at 14–15, 31, Docket # 66 Ex. 6).

41.    Chapman characterized the plywood as substandard because it bore no

resemblance to BC plywood, which was the grade McCormick was supposed to

supply.  (Chapman Dep. A at 15; May 22, 2002, email).

42.    Upon seeing the treated plywood, Chapman immediately concluded that something

was wrong with it.  (Chapman Dep. A at 15).  The plywood had big voids,

checkmarks, and delaminations.  (Chapman Dep. A at 14).

43.    However, Chapman decided to use the substandard plywood in the buses in order

to keep the manufacturing line running.  (Chapman Dep. A at 16–17).

44.    Chapman contacted Forrest of McCormick that same day to discuss the
       problematic plywood shipment.  (Chapman Dep. A at 30–31).

45.    Forrest told Chapman on August 13, 2002, that the plywood supplied met
       International Truck's specifications.  (Deposition of Peter Chapman ("Chapman
       Dep. B") at 76–77, Docket # 88 Ex. 3).

46.    Due to his experience, Chapman doubted Forrest's assertion that the plywood was
       BC grade or equivalent thereto.  (Chapman Dep. A at 133).

47.    By the time Chapman spoke with Forrest for the first time, on August 13, 2002,
       Chapman had already made the decision to use the substandard plywood in order
       to keep the manufacturing line running.  (Chapman Dep. A at 109).

48.    When Chapman spoke to Forrest the next day, Forrest said the mill must have
       made an error in supplying the less-than-BC-grade plywood.  (Chapman Dep. B at
       77).

49.    International Truck charged back $47,127.96 to McCormick for downtime at its
       plant due to the problems with McCormick's shipment of treated plywood.
       (McCormick's Complaint at ¶ 26).

### 2.    Price of Untreated Plywood

50.    Forrest repeatedly told Chapman that he could not obtain a sheet of untreated, BC
       grade plywood for less than $22 a sheet.  (Chapman Dep. B at 79; International
       Truck's Response to McCormick's First Interrogatories at 5, Docket # 66 Ex. 3).

51.    However, after Forrest made those assertions, Chapman told Forrest that Lowe's

had BC APA plywood southwestern yellow pine at $17 a sheet.  (Chapman Dep. B at 79).

### F.    Breach of Contract Claims

### 1.    CSA Requirements for QS-9000 or ISO-9000 Certification

52.    By January 1, 2002, the CSA required that McCormick be third-party registered to QS-9000, a quality management system used in the automotive and truck manufacturing industry.  (CSA at ¶ 5A).  The CSA states:

> [McCormick] agrees to maintain third-party QS-9000 registration through surveillance assessments for the life of this Agreement. [International Truck's] representatives are willing to work with [McCormick] to upgrade [McCormick's] system to satisfy said standard by the date specified by [International Truck]. [McCormick's] failure, in [International Truck's] opinion, to maintain an acceptable rating for a continuous period in excess of six (6) months or re-survey period as defined in the QS-9000 will, at [International Truck's] sole option, be cause to terminate this Agreement with regard to the particular Products affected by such failure.

(CSA at ¶ 5A).

53.    ISO-9000 certification is an acceptable substitute for QS-9000 certification. (Deposition of Matthew Warrelman ("Warrelman Dep. C") at 78, Docket # 92 Ex. 3).

54.    McCormick began the process of becoming ISO-9000 certified in 2000. (Deposition of Rod Forrest ("McCormick Rule 30(b)(6) Dep.") at 13, Docket # 92 Ex. 5).

55.    Mr. Forrest of McCormick initially told International Truck that it would be QS-

16

9000 certified by December 2000 because that was McCormick's intention. (Deposition of Thomas R. Forrest "Forrest Dep. D" at 47, Docket # 92 Ex. 2).

56. However, McCormick's efforts to become ISO-9000 certified ended in 2002 after its facility in Spencer, Indiana closed.  (McCormick Rule 30(b)(6) Dep. at 16). McCormick never became third-party registered to ISO-9000 requirements. (McCormick Rule 30(b)(6) Dep. at 21).

57. International never reminded McCormick about its failure to become ISO-9000 or QS-9000 certified.  (Forrest Dep. D at 82).

58. When International Truck notified McCormick that it would no longer be buying plywood from McCormick, International Truck noted that McCormick had not become ISO or QS certified by January 1, 2002, as set forth in the CSA.  (ISDM Feedback, Docket # 101 Ex. 3).

## 2.   CSA Requirement for EDI

59. The CSA also required McCormick to communicate with International via Electronic Data Interchange ("EDI"), a system that allows suppliers and producers to share information electronically.  (CSA at ¶ 8; Deposition of Richard Baran ("Baran Dep.") at 21, Docket # 92 Ex. 9).  The CSA stated specifically: "[McCormick] agrees to communicate and receive all current and future EDI transactions deemed necessary by [International Truck] for both production and service parts requirements."  (CSA at ¶ 8).

60. Near the end of 2000 or during 2001, Forrest of McCormick spoke to

McCormick's comptroller, Angela Daugherty ("Daugherty"), about implementing EDI.  (Deposition of Angela Daugherty "Daugherty Dep." at 17–18, Docket # 92 Ex. 7).

61.    On April 3, 2001, International Truck sent Daugherty an email requesting McCormick use EDI with International Truck's Conway, Arkansas and Tulsa, Oklahoma plants.  (Daugherty Dep. at 31).  International Truck sent Daugherty a follow-up email on May 16, 2001, asking about McCormick's status regarding EDI.  (May 16, 2001, EDI email, Docket # 92 Ex. 9).

62.    On December 10, 2002, McCormick sent International Truck a letter notifying them that McCormick was updating its computer system, which would enable it to implement EDI.  (December 10, 2002, letter, Docket # 92 Ex. 11).

63.    However, McCormick never communicated with International Truck through EDI. (Daugherty Dep. at 18).

### G.    Termination of Relationship between International Truck and McCormick

64.    In April 2003, International Truck put its contracts for plywood out for bid.  (April 17, 2003, letter, Docket # 92 Ex. 22).  McCormick submitted a bid in May 2003. (May 21, 2003, email, Docket # 92 Ex. 23).

65.    In May 2003, International Truck told McCormick that it would no longer be using McCormick to supply its plywood needs beginning in August 2003.  (June 12, 2003, email, Docket # 92 Ex. 12).

66.    International Truck's reasons for no longer using McCormick were provided in an
       International Source and Decision Matrix ("ISDM").  (ISDM Feedback;
       Warrelman Dep. C at 24).

67.    Those reasons included: not becoming QS or ISO certified, not having EDI
       capabilities, slow bidding, lack of a partnership feel, and poor quality.  (ISDM
       Feedback).

68.    International Truck terminated its supplier relationship with McCormick effective
       August 8, 2003.  (July 28, 2003, email, Docket # 92 Ex. 25).


**V.    Choice of Law**

        A dispute exists in this case regarding which state's law applies to the contract

claims raised by both parties and the fraud claim asserted by International Truck.  Where

a federal court's subject matter jurisdiction is based on diversity of citizenship, the forum

state's choice of law rules govern which state's substantive law applies.  *Sound of Music

Co. v. Minn. Min. & Mfg. Co.*, 477 F.3d 910, 915 (7th Cir. 2007).

        **1.    Contract claims**

        Indiana's version of the UCC, which undisputably governs the contract claims at

issue here, states that where the parties do not have an agreement regarding choice of law,

"[The UCC] applies to transactions bearing an appropriate relation to this state."  IND.

CODE § 26-1-1-105 (2003).  The analysis under the appropriate relation test is the same as

that under Indiana's intimate contacts test used for choice-of-law disputes in contract

19

actions  *See Dart Indus., Inc. v. Adell Plastics, Inc.*, 517 F. Supp. 9, 10-11 (S.D. Ind.

1980).

Under the intimate contacts test, the court considers: (a) the place of contracting,

(b) the place of negotiation of the contract, (c) the place of performance, (d) the location

of the subject matter of the contract, and (e) the domicile, residence, nationality, place of

incorporation and place of business of the parties. *Hartford Accident & Indem. Co. v.

Dana Corp.*, 690 N.E.2d 285, 291 (Ind. Ct. App. 1997).  On its own, the place of

contracting is a relatively insignificant contact.  *Id*. at 293 (citing RESTATEMENT

(SECOND) OF CONFLICT OF LAWS § 188 cmt. e. (1971)).  The place of negotiation "is of

less importance when there is no one single place of negotiation as . . . when the parties

do not meet but rather conduct their negotiations from separate states by mail or

telephone."  *Id*. (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 cmt. e.

(1971)).

In this case, the place of contracting is Indiana, as that is where the contract was

ultimately signed by McCormick.  Neither the place of negotiation or the domicile of the

parties is probative here, as the parties' negotiations took place by mail between Illinois

and Indiana, and the parties are domiciled in those two states.  Performance occurred in

both Arkansas and Oklahoma.  International Truck directed its plywood orders to

McCormick's facility in Arkansas.  Then, McCormick supplied the plywood to

International Truck's facilities in Oklahoma and Arkansas.  The location of the subject

matter was in Arkansas where McCormick actually took possession of and cut the

plywood that was then supplied to International Truck.  Considering that the location of the subject matter and part of the performance occurred in Arkansas, the court finds that Arkansas has the most intimate contacts with the present contract dispute.

### 2.    Fraud Claim

Although International Truck asserts that Arkansas law should apply to its fraud claim, citing the Indiana rule of lex loci delicti (the place of the wrong), it concedes that the outcome will be the same regardless of whether Illinois, Indiana, or Arkansas law applies because the common law fraud rule is the same in all three jurisdictions.  In this court's Entry on McCormick's motion to dismiss International Truck's fraud claim, the court held, relying on Indiana law, that International Truck was entitled to bring a separate fraud claim in addition to its breach of contract claim.  To maintain consistency in the case, the court will therefore continue to apply Indiana law to the fraud claim.


## VI.    McCormick's Motion for Partial Summary Judgment

McCormick moves for partial summary judgment on International Truck's counterclaims for breach of warranty, fraud, and breach of contract related solely to the issue of indemnity.  The court will discuss the merits of each in turn below.

### A.    Breach of Warranty

McCormick asserts that it is entitled to summary judgment on International Truck's breach of warranty counterclaim because International Truck failed to give McCormick sufficient and timely notice required under UCC § 2-607(3)(a); McCormick

21

disclaimed all implied warranties; and International Truck's inspection of the treated

plywood should have exposed the corrosion problem, thus barring it from now asserting a

claim for breach of warranty.

### 1.   Notice

McCormick's Brief in Support and Reply make clear that McCormick's notice

defense to International Truck's breach of implied warranty claim only regards the issue

of corrosion.  As such, the court will consider McCormick's notice argument with respect

to corrosion alone.  McCormick argues that International Truck's notice of breach was

not reasonable; thus, International Truck's claim is barred.  However, International Truck

asserts that the decision of whether notice was adequate is a question of fact for the jury

and thus improper for summary judgment.

The relevant provision of the UCC sets forth: "Where a tender has been accepted

(a) the buyer must within a reasonable time after he discovers or should have discovered

any breach notify the seller of breach or be barred from any remedy . . . ."  ARK. CODE §

4-2-607(3)(a).  The comments to this section provide:

> The content of the notification need merely be sufficient to let the seller
> know that the transaction is still troublesome and must be watched.  There
> is no reason to require that the notification which saves the buyer's rights
> under this section must include a clear statement of all the objections that
> will be relied on by the buyer . . . .  The notification which saves the buyer's
> rights under this Article need only be such as informs the seller that the
> transaction is claimed to involve a breach, and thus opens the way for
> normal settlement through negotiation."

ARK. CODE § 4-2-607 cmt. 4.  "The purpose of the [notice] requirement is to enable the

seller to minimize damages in some way, such as correcting the defect and to give some

immunity from stale claims." *Cotner v. Int'l Harvester Co.*, 545 S.W.2d 627, 630 (Ark.

1977). Nonetheless, under Arkansas law, the notice requirement is liberally construed.

*See Wilson v. Marquette Elecs., Inc.*, 630 F.2d 575, 584 (8th Cir. 1980) (applying

Arkansas law). "Whether a time for taking an action required by [the UCC] is reasonable

depends on the nature, purpose, and circumstances of the action." ARK. CODE § 4-1-

205(a). As such, typically the question of reasonableness of notice, regarding time, form,

or substance, is a question of fact. *Greenfield Seed Co. v. Bland*, 710 S.W.2d 833, 835

(Ark. Ct. App. 1986).

     In this case, International Truck notified McCormick of problems with the treated

plywood almost immediately upon receiving the "substandard" shipments in August

2002. At that point in time, International Truck complained about voids, checkmarks,

and delaminations in the plywood. Further, in June 2003, International Truck notified

McCormick in the ISDM of the intermittent quality problems with its treated plywood

and that International Truck had received a warranty claim from one of its customers

related to McCormick's plywood delaminating. However, International Truck did not

discover the corrosion problem until August 2003 and did not notify McCormick about

the corrosion issue until December 2005.[3] As such, the earlier notifications by

---

     [3] International Truck's reliability manager, Alan Osterkil, testified that someone in
International Truck's purchasing department told him that someone had contacted McCormick in
August 2003 about the corrosion issue. (Fact # 29, *supra*). However, that testimony is
inadmissible to prove that International Truck had in fact contacted McCormick because Alan
Osterkil lacked personal knowledge of that fact in violation of Federal Rule of Evidence 602 and

International Truck before August 2003 did not satisfy UCC § 2-607(3)(a) because they related in no way to corrosion, and could not have related to corrosion because International Truck was not yet aware of the issue.  The purpose of this provision is, in part, to allow the seller (McCormick) an opportunity to minimize damages.  Without knowledge of what the issue was, McCormick could not have taken any steps to minimize damages.

Therefore, the question becomes whether notice of corrosion in December 2005, when International Truck learned of the issue in August 2003, satisfies the reasonableness requirement of UCC § 2-607.  International Truck asserts that it is still investigating the scope and severity of the corrosion problem, presumably as a defense to its delay in notifying McCormick of the problem.  Under Arkansas law, whether notification was made within a reasonable time under UCC § 2-607 depends on the circumstances of a particular situation.  The court has found no cases where Arkansas courts have held that a buyer delayed so long in notifying the seller of breach that, as a matter of law, the period of time was unreasonable.  As such, the court must leave for the jury the issue of whether International Truck's notice was made within a reasonable time.

### 2.    Disclaimer

McCormick next argues that International Truck is barred from asserting a breach of implied warranty claim because McCormick disclaimed all implied warranties in its "Ten Year Plywood Subflooring Limited Warranty."  International Truck does not

_____

that testimony is inadmissible hearsay in violation of Federal Rule of Evidence 802.

dispute that McCormick's disclaimer language would disclaim the implied warranties of

merchantability and fitness for a particular purpose.  However, International Truck asserts

that McCormick's limited warranty only applies to first-owners of International Truck's

buses, not International Truck itself.

> The warranty states in pertinent part:
>
> J.M. McCormick Company agrees to warrant only *PROPERLY PROCESSED pressure preservatively treated wood plywood products . . . .
>
> (*"Properly Processed" pressure preservatively treated wood is defined as the independently owned and operated treating facility treating any and all pressure preservatively treated wood products, purchased by International [Truck] . . . .)
>
> Original purchasers or "first-owners" of specific pressure preservatively treated plywood bus subflooring products from J.M. McCormick Company, Inc. containing solely Osmose brand NW100 registered Chemical(s) are eligible for a **TEN YEAR LIMITED WARRANTY**. . . .
>
> FIRST OWNER COVERAGE
> To qualify for the pressure preservatively treated plywood Ten Year Plywood Subflooring Limited Warranty, the claim must be made by the original purchaser of a bus which contains NatureWood preserved plywood supplied by J.M. McCormick Company.  This warranty is not transferable from the first-owner to subsequent owner of the bus. . . .
>
> NOTE: The obligation of J.M. McCormick Company under the terms of this Warranty is limited to replacement of damaged pressure preservatively treated plywood only.  **J.M. McCormick Company make [sic] no other warranties, express or implied, of merchantability, fitness for a particular purpose or otherwise**. . . .

(McCormick Limited Warranty at 1, 3).

The court must interpret a contract based on the instrument as a whole, not merely

on disjointed or particular parts thereof.  *Southway Corp. v. Metro. Realty & Dev. Co.,*

*LLC*, 206 S.W.3d 250, 254 (Ark. Ct. App. 2005).  "A construction which neutralizes any provision of a contract should never be adopted if the contract can be construed to give effect to all provisions."  *Id.*

Based upon a complete reading of McCormick's limited warranty, it is clear that the warranty extends only to first-purchasers of buses.  Although the language at the beginning of the third paragraph quoted above refers to original purchasers of bus subflooring products, which on its own, would seem to apply to International Truck as the first purchaser of McCormick's treated plywood, a reading of the entire warranty clarifies that the warranty does not apply to International Truck.  The paragraph underneath "First Owner Coverage" defines a first-owner as the original purchaser of a bus.  Further, the warranty specifies that to make a claim under the warranty, the original owner of the bus must take certain steps, indicating that only the original owner of the bus is entitled to make claims under the warranty.  Additionally, the warranty refers to International Truck by name in the second paragraph but then refers to original purchasers in separate terms. This casts doubt on McCormick's assertion that the disclaimer applied to International Truck.  Considering the warranty as a whole and giving effect to each provision, the court finds that McCormick's limited warranty does not apply to International Truck.  As such, McCormick's disclaimer of the implied warranties of merchantability and fitness for a particular purpose is not effective against International Truck and does not bar its breach of warranty claims against McCormick.

26

### 3.    Inspection

The last ground under which McCormick seeks to preclude International Truck's

claim for breach of warranty is that International Truck tested McCormick's treated

plywood for corrosion before purchasing it.  International Truck asserts that its inspection

does not bar its warranty claim because the corrosion was not detectable by the test it

performed.

UCC § 2-316, addressing exclusion or modification of warranties, sets forth:

"[W]hen the buyer before entering into the contract has examined the goods or the sample

or model as fully as he desired or has refused to examine the goods there is no implied

warranty with regard to defects which an examination ought in the circumstances to have

revealed to him . . . ."  ARK. CODE § 4-2-316(3)(b).  The comments to this section

explain:

> The particular buyer's skill and the normal method of examining goods in
> the circumstances determine what defects are excluded by the examination.
> A failure to notice defects which are obvious cannot excuse the buyer.
> However, an examination under the circumstances which do not permit
> chemical or other testing of the goods would not exclude defects which
> could be ascertained only by such testing.  Nor can latent defects be
> excluded by simple examination.  A professional buyer examining a
> product in his field will be held to have assumed the risk as to all defects
> which a professional in the field ought to observe, while a nonprofessional
> buyer will be held to have assumed the risk only for such defects as a
> layman might be expected to observe.

ARK. CODE § 4-2-316 cmt. 8.

In this case, International Truck tested McCormick's plywood for corrosion in

April 2002, before McCormick began supplying it treated plywood.  The test performed

by International Truck revealed that the treated plywood did not cause corrosion to the metal floor screws.  Presumably after International Truck started receiving customer complaints about corrosion in bus floors, International Truck ran a different test on the treated plywood that did reveal corrosion, although not at the levels International Truck experienced in the field.  The second test was one set forth by the AWPA and was available in April 2002 when International Truck did its initial testing.  However, International Truck was unaware of the AWPA test in April 2002.  A representative of International Truck explained that International Truck was not a plywood expert and that it relied primarily on its suppliers to provide testing information.

International Truck performed testing specifically related to corrosion and detected no problems.  Whether International Truck should have been aware of the AWPA test and performed that test as a professional buyer is a question for the jury.  The parties have submitted no evidence of the industry standard regarding testing of plywood.  Thus, the court cannot decide as a matter of law that International Truck "ought" to have observed corrosion by using the AWPA test in April 2002.  As such, a material issue of genuine fact regarding inspection remains for the jury.

For the reasons set forth above, McCormick's motion for summary judgment on International Truck's claims for breach of warranty is **DENIED**.

### B.    Breach of Contract: Indemnification

McCormick next moves for summary judgment on International Truck's breach of contract claim for failure to indemnify arguing that the indemnification clause at issue

28

was not part of the parties' contract. International Truck asserts that the indemnification clause is enforceable because the parties contemplated a new contract for treated plywood, and the green sheet, of which the indemnification clause was a part, represented that final agreement. Alternatively, even if the CSA continued to govern International Truck's needs for treated plywood, the CSA contemplated that the green price sheets containing the indemnification clause would supplement their agreement.

Under Arkansas law, "[t]he question of whether a contract has been made must be determined from a consideration of the parties' expressed or manifested intention determined from a consideration of their words and acts." *Johnston v. Curtis*, 16 S.W.3d 283, 287 (Ark. Ct. App. 2000). "[W]hen a contract is ambiguous as to the intent of the parties, and the meaning of the language depends on disputed extrinsic evidence, the issue is a question of fact for the jury." *Perry v. Baptist Health*, 189 S.W.3d 54, 58 (Ark. 2004).

In this case, International Truck asserts that a new contract existed for the shipment of treated plywood and refers to the email communication sent between International Truck and McCormick on May 22–23, 2002. The email sent by International Truck referenced a "new contract," and McCormick replied that it accepted International Truck's terms. International Truck asserts that the final agreement of that email communication was one of International Truck's green price sheets, which contained a form indemnification clause on the back. However, that green price sheet reflects none of the terms the parties agreed upon in their communications. The green

price sheets had been used by the parties before to reflect a change in the price of untreated plywood pursuant to the CSA.  Also, there is no evidence that McCormick signed one of the green price sheets reflecting the parties' "new" contract governing treated plywood.  Further, an internal International Truck document from 2003 reflected that International Truck had a current CSA with McCormick, indicating that the CSA initially governing the parties' agreement with respect to untreated plywood extended to treated plywood as well.  Considering these facts, a genuine issue of material fact exists about whether a new contract was formed regarding treated plywood, and whether the green price sheet, containing the indemnification clause, reflected the parties' new agreement.

International Truck's second argument regarding the indemnification clause is that it was a supplemental term contemplated by the CSA.  Under the UCC, additional terms in an acceptance or written confirmation between merchants become part of the contract unless they materially alter it.  ARK. CODE § 4-2-207(2)(b).  Terms that materially alter a contract are those that would "result in surprise or hardship if incorporated without express awareness by the other party."  ARK. CODE § 4-2-207 cmt. 4.  Whether a term materially alters a contract is a question of fact to be resolved by the circumstances of each case.  *N & D Fashions, Inc. v. DHJ Indus., Inc.*, 548 F.2d 772, 726 (8th Cir. 1976).  Arkansas courts will uphold indemnity clauses where a party's intent is to indemnify another for losses resulting from its own negligence is clearly expressed.  *Weaver-Bailey Contractors, Inc. v. Fiske-Carter Constr. Co.*, 657 S.W.2d 209, 211 (Ark. Ct. App. 1983).

In this case, International Truck sent confirmations of price changes under the CSA on a green price sheet, containing the indemnification clause on the back.  The parties do not dispute that the indemnification clause on the green sheet confirmation was an additional term.  However, it is disputed whether the indemnification clause materially altered the contract.  As Arkansas courts will uphold indemnity clauses in certain circumstances, whether the indemnification clause materially altered the contract between International Truck and McCormick is a question for the jury.  For these reasons, the court must **DENY** McCormick's motion for summary judgment on the indemnification aspect of International Truck's breach of contract claim.

### C.     Fraud

McCormick last moves for summary judgment on International Truck's claims for fraud arising out of McCormick's alleged misrepresentations about the quality of the treated plywood on August 13, 2002, and the competitiveness of the price of the treated plywood during the parties' relationship.  Under Indiana law, the elements required to establish a claim of fraud are: (1) a material misrepresentation of past or existing fact by the party to be charged, which; (2) was false; (3) was made with knowledge or in reckless ignorance of the falsity; (4) was relied upon by the complaining party; and (5) proximately caused injury to the complaining party.  *Precision Homes of Ind., Inc. v. Pickford*, 844 N.E.2d 126, 131 (Ind. Ct. App. 2006).

With respect to the August 13, 2002, shipment, Chapman of International Truck testified that he knew immediately upon receiving the shipment that it was substandard.

31

Further, he testified that he made the decision to incorporate the substandard plywood into International Truck's buses before he spoke to Forrester of McCormick. As such, International Truck cannot show that it relied on Forrester's later alleged misrepresentations about the quality of the plywood. Chapman made the decision before even speaking to Forrester that he was going to use the substandard plywood to keep the manufacturing line going. As such, International Truck fails in the essential element of reliance for its fraud claim with respect to the August 13, 2002, shipment as a matter of law.

Regarding International Truck's claim with respect to McCormick's price of treated plywood, International Truck likewise fails to establish an essential element of its claim. The only evidence that International Truck submits in support of its claim is the testimony of Chapman of International Truck. According to Chapman, Forrest of McCormick asserted he could not get treated plywood at less than $22 a sheet, but Chapman saw the same treated plywood for $17 a sheet at Lowe's, a retail store. International Truck puts forth no evidence that McCormick knew that it could get the treated plywood at a price cheaper than $22 a sheet. While Chapman testified that he found a cheaper price at a retail store, the CSA set forth a specific pricing mechanism based upon the published prices in *Random Lengths*, an industry publication. Since the price of plywood under the parties' agreement was based on an industry publication, the fact that a retail store had a cheaper price is insufficient to demonstrate on its own that McCormick either knowingly misrepresented the fact that it could not provide treated

32

plywood at less than $22 a sheet or was recklessly ignorant when making that statement. As such, McCormick's motion for summary judgment on International Truck's fraud claim relating both to competitiveness of price and the August 13, 2002, shipment is **GRANTED**.

In conclusion, McCormick's motion for summary judgment is **DENIED** on International Truck's claims for breach of warranty and breach of contract for failure to indemnify and **GRANTED** on International Truck's fraud claims.

## VII.   International Truck's Motion for Summary Judgment

International Truck also moves for summary judgment on McCormick's claims for breach of contract on the grounds that McCormick is barred from suing under the CSA because it failed to perform all material obligations under the CSA and that the CSA did not govern the supply of treated plywood.  McCormick argues that summary judgment is improper because International Truck failed to give it notice before it breached the CSA, as was required by the CSA's competitive clause, and International Truck failed to demand adequate assurances from McCormick.

As discussed in Section VI.B., *supra*, a genuine issue of material fact exists concerning whether the CSA governed the parties' relationship with respect to treated plywood or whether a new contract was formed.  The email sent by International Truck to McCormick in May 2002 references a new contract for treated plywood and includes terms specific to that agreement, which McCormick expressly accepted in an email sent

to International Truck the next day.  However, International Truck also referred to its green price sheets as "contracts," and no written agreement reflecting the terms in International Truck's email was ever executed.  In addition, a plain reading of that email reflects that the pricing agreed upon would apply for one year, not that the agreement itself was for one year.  Thus, a jury could infer that the May 2002 email communications referenced a change in the price sheets being used, rather than the intent to form a contract to supercede the CSA.  Additionally, an internal International Truck document from 2003, when McCormick was supplying treated plywood, referenced that International Truck had a current CSA with McCormick, thus indicating that the CSA governed treated plywood.  For these reasons, a genuine issue of material fact exists about whether the CSA governed McCormick's supply of treated plywood.

International Truck asserts in the alternative that even if the CSA applied to treated plywood, McCormick is barred from suing under the CSA because it never became QS-9000 registered nor did it implement EDI, both material obligations under the CSA.  As the basis for its argument, International Truck relies on the maxim: "The party who first breaches a contract is in no position to take advantage of a later breach by the other party." *Stocker v. Hall*, 602 S.W.2d 662, 664–65 (Ark. 1980).  However, the agreement between the parties is undisputably governed by the UCC.  The principles of law and equity supplement the provisions of the UCC, unless those principles are displaced by particular provisions of the UCC.  ARK. CODE § 4-1-103.  The UCC has set forth specific provisions governing breach of a sales contract by buyers and sellers and remedies to be

sought for such a breach.  *See TB of Blythesville, Inc. v. Little Rock Sign & Emblem, Inc.*,

946 S.W.2d 930, 932 (Ark. 1997) ("[T]he UCC has given buyers and sellers specific

remedies for breach of sales contracts and the warranties therein . . . ."); ARK. CODE §§ 4-

2-601–725 (applicable UCC sections on breach and remedies).  Thus, the maxim cited by

International Truck has arguably been superceded by the UCC's specific provisions on

breach.  At this point, however, the court does not have to answer that question, as the

court finds that § 2-208 of the UCC governs the situation at hand.

Section 2-208(1) addresses the significance of the parties' course of performance

and  reads:

> Where the contract for sale involves repeated occasions for performance by
> either party with knowledge of the nature of the performance and
> opportunity for objection to it by the other, any course of performance
> accepted or acquiesced in without objection shall be relevant to determine
> the meaning of the agreement.

ARK. CODE § 4-2-208(1).  Comment 1 to this section provides: "The parties themselves

know best what they have meant by their words of agreement and their action under that

agreement is the best indication of what that meaning was."  ARK. CODE § 4-2-208 cmt.

1.  Further, under Arkansas law, waiver is defined as:

> the voluntary abandonment or surrender by a capable person of a right
> known to him to exist, with the intent that he shall forever be deprived of its
> benefits, and it may occur when one, with full knowledge of the material
> facts, does something which is inconsistent with the right or his intention to
> rely upon it.

*Bio-Tech Pharmacal, Inc. v. Int'l Bus. Connections, LLC*, 184 S.W.3d 447, 452 (Ark. Ct.

App. 2004).  The question of waiver is one of fact.  *See id.*

The case at bar clearly involves a course of performance between International Truck and McCormick.  McCormick supplied plywood to International Truck under the CSA for arguably three years from September 2000 through August 2003.  The parties' course of performance in this case is relevant to whether International Truck waived the provisions of the CSA obligating McCormick to implement QS-9000 and EDI.

Under the CSA, McCormick was to have implemented QS-9000 on January 1, 2002.  The evidence indicates that International Truck never reminded McCormick about becoming QS-9000 certified, and after McCormick failed to become QS-9000 certified, International Truck accepted shipments of plywood from McCormick for another year and a half.  Regarding the implementation of EDI, the evidence shows that International Truck sent McCormick a request in April 2001 that it use EDI and followed up on that request in May 2001.  The evidence does not indicate any further communication from International Truck to McCormick about EDI.  McCormick never implemented EDI. However, International Truck continued to receive shipments of plywood from McCormick for more than two years after its last request for McCormick to implement EDI.  From this evidence, a reasonable jury could conclude that International Truck waived McCormick's obligation to implement QS-9000 and EDI.  As such, summary judgment is inappropriate and a genuine issue of material fact exists as to whether International Truck waived McCormick's obligation to utilize both QS-9000 and EDI.

Although the court finds that summary judgment on McCormick's breach of contract claims is not appropriate, the court notes that McCormick's arguments regarding

36

the CSA's competitive clause and the demand for adequate assurances are unavailing. With respect to the competitive clause, the clear language of that clause in the CSA references only "particular product part numbers."  Neither QS-9000 or EDI are particular product parts supplied by McCormick.  QS-9000 was a quality system and EDI was an electronic data system both of which McCormick was to implement as part of its supplier relationship with International Truck.  As such, the competitive clause on its face did not apply to the QS-9000 and EDI requirements in the CSA and thus did not require International Truck to allow McCormick the opportunity to cure its deficiencies with respect to these two programs before International Truck breached the CSA.

McCormick also asserts that UCC § 2-609, which governs a party's right to adequate assurance of performance, required International Truck to demand adequate assurances from McCormick when it became insecure in McCormick's performance. However, McCormick misinterprets the language of UCC § 2-609.  Section 2-609 states in pertinent part: "When reasonable grounds for insecurity arise with respect to the performance of either party the other *may* in writing demand adequate assurance of due performance . . . ."  ARK. CODE § 4-2-609(1) (emphasis added).  In giving meaning to a statute, the court must give words their ordinary meaning, and if the language is plain and unambiguous, the analysis need not go farther.  *Ford Motor Credit Co. v. Ellison*, 974 S.W.2d 464, 467 (Ark. 1998).  The language clearly states that a party "may" require adequate assurances, indicating that demanding adequate assurances is permissive.  *See* BLACK'S LAW DICTIONARY 993 (7th ed. 1999) (defining "may" as "permissive" or

"discretionary").  As such, International Truck was not required to demand adequate assurances from McCormick, and its failure to do so does not otherwise affect International Truck's remedies for McCormick's alleged breach.

Because a factual dispute exists as to whether the parties had a separate agreement governing treated plywood and whether International Truck waived McCormick's obligations to implement QS-9000 and EDI under the CSA, International Truck's motion for summary judgment is **DENIED**.


## VIII.   International Truck's Request for Oral Argument

International Truck has requested oral argument on the above motions.  While the issues in this case involve complex areas of commercial law, the parties' briefs sufficiently set forth their arguments addressing both pending summary judgment motions.  As such, the court finds oral argument unnecessary to rule on the pending motions.  International Truck's motion for oral argument is therefore **DENIED**.


## IX.   Conclusion

For the foregoing reasons, International Truck's motion to supplement evidence in response to McCormick's motion for partial summary judgment (Docket # 103) is **DENIED**.   McCormick's motion for partial summary judgment (Docket # 65) is **DENIED** on International Truck's claims for breach of warranty and breach of contract

for failure to indemnify and **GRANTED** on International Truck's claims for fraud. International Truck's motion for summary judgment on McCormick's breach of contract claims (Docket # 90) is **DENIED** in its entirety.  International Truck's motion for oral argument (Docket # 105) on the pending summary judgment motions is also **DENIED**.

**SO ORDERED** this 28th day of September 2007.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic copies to:

John M T Chavis II
LOCKE REYNOLDS LLP
jchavis@locke.com

Darren Andrew Craig
LOCKE REYNOLDS LLP
dcraig@locke.com

Offer  Korin
KATZ & KORIN
okorin@katzkorin.com

Peter S. Kovacs
STEWART & IRWIN
pkovacs@silegal.com

Nicholas C. Pappas
LOCKE REYNOLDS LLP
npappas@locke.com

Patrick J. Perrone
McCARTER & ENGLISH, LLP
pperrone@mccarter.com

Mary F. Schmid
STEWART & IRWIN
mschmid@stewart-irwin.com

Ronald George Sentman
KATZ & KORIN
rsentman@katzkorin.com

Matthew J. Tharney
McCARTER & ENGLISH, LLP
mtharney@mccarter.com

Natalie S. Watson
McCARTER & ENGLISH, LLP
nwatson@mccarter.com